## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 94-DP-00248-SCT

*JOSEPH PATRICK BROWN A/K/A "PEANUT"*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/12/94 |
| TRIAL JUDGE: | HON. RICHARD T. WATSON |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | PAMELA A. FERRINGTON |
| | DONALD G. OGDEN |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  MARVIN L. WHITE, JR. |
| | LESLIE S. LEE |
| DISTRICT ATTORNEY: | STURGEON, ALONZO, |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 8/15/96 |
| MOTION FOR REHEARING FILED: | 9/13/96 |
| MANDATE ISSUED: | 10/24/96 |

**EN BANC.**

**DAN LEE, CHIEF JUSTICE, FOR THE COURT:**

¶1. Appellant, Joseph Patrick Brown ("Brown"), was indicted by an Adams County Grand Jury on June 21, 1993, on a charge of capital murder. The trial court's order granting Brown's motion for a change of venue, transferring the trial to Amite County, Mississippi, was later amended, limiting the transfer of venue to the "limited purpose only of empaneling and selecting a jury." Trial commenced on March 8, 1994, in the Circuit Court of Adams County, Mississippi before the Honorable Richard T. Watson, Circuit Judge. The jury, duly impaneled from the citizens of Amite County, Mississippi, found Brown guilty as charged. At the close of the sentencing phase, the jury returned a verdict that Brown suffer death. On March 12, 1994, Judge Watson sentenced Brown to death by lethal injection.

¶2. A Motion for New Trial was timely filed by Brown but was denied by the lower court. From the Order denying his Motion for a New Trial, Brown perfected this appeal, raising the following assignments of error:

**I. THE COURT BELOW ERRED IN DENYING APPELLANT'S MOTION FOR DIRECTED VERDICT BECAUSE THE TESTIMONY OF AN ACCOMPLICE OR CO-CONSPIRATOR IS INSUFFICIENT TO SUSTAIN A CONVICTION WHEN THAT TESTIMONY IS SUBSTANTIALLY IMPEACHED, UNREASONABLE, OR SELF-CONTRADICTORY,**

**II. THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF A "JAIL HOUSE SNITCH" TO CORROBORATE THE TESTIMONY OF A CO-CONSPIRATOR AND ACCOMPLICE,**

**III. THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF A WITNESS WHO HAD BEEN PRESENT IN THE COURTROOM AFTER THE SEQUESTRATION RULE HAD BEEN INVOKED,**

**IV. THE TRIAL COURT ERRED IN ADMITTING A .22 HANDGUN AND TESTIMONY RELATIVE TO THE WEAPON INTO EVIDENCE WHEN THE CHAIN OF CUSTODY HAD BEEN BROKEN AND ITS PROBATIVE VALUE WAS SUBSTANTIALLY OUTWEIGHED BY THE POTENTIAL FOR PREJUDICE AND FOR MISLEADING THE JURY,**

**V. THE TRIAL COURT ERRED IN ADMITTING CERTAIN LETTERS INTO EVIDENCE THAT WERE WRITTEN BY APPELLANT TO RACHEL WALKER AFTER HE HAD ASSERTED HIS CONSTITUTIONAL RIGHTS TO SILENCE AND TO COUNSEL,**

**VI. THE TRIAL COURT ERRED IN ADMITTING UNNECESSARY AND GRUESOME AUTOPSY PHOTOGRAPHS INTO EVIDENCE,**

**VII. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY TO CONSIDER THE ROBBERY AS AN AGGRAVATING CIRCUMSTANCE IN VIOLATION OF STATE LAW AND CONTRARY TO CONSTITUTIONAL PROHIBITIONS AGAINST CRUEL AND UNUSUAL PUNISHMENT,**

**VIII. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT THEY COULD CONSIDER AS AN AGGRAVATING FACTOR THAT THE MURDER WAS COMMITTED FOR THE PURPOSE OF AVOIDING ARREST, AND**

**IX. THE AGGREGATE ERROR IN THE COURT BELOW SERVED TO DENY APPELLANT HIS RIGHT TO A FAIR TRIAL AND REQUIRES REVERSAL OF BROWN'S CONVICTION AND SENTENCE.**

¶3. It is the opinion of this Court that none of Brown's assignments of error have merit; therefore, both his conviction and sentence are affirmed.

## STATEMENT OF THE FACTS

¶4. The record reveals that during the late evening hours of Friday, August 7, 1992 and the early morning hours of Saturday, August 8, 1992, Brown and his girl-friend at the time, Rachel Walker

("Walker"), were cruising the area of Natchez, Mississippi, looking for drugs. Brown and Walker bought and smoked crack cocaine at several locations during that time period.

¶5. In the early hours of August 8, Brown turned the vehicle he was driving into the lot of the Charter Food Store located on Highway 61 South in Natchez, Mississippi, and stopped the vehicle next to the gas pumps. Walker, remaining in the vehicle, observed Brown pump gas into the vehicle and then walk into the store. While Brown was inside the store, Walker observed him walk around briefly and then approach the counter where the cash register and clerk were located. While Brown was at the counter, Walker observed the clerk, Martha Day ("Day"), grab her chest, turn and fall to the floor. Walker didn't see Day again. It was later to be discovered that Day was killed during an apparent robbery at approximately 2:45 a.m. Day was shot four times - once in the head, once through the heart, and twice in the back.

¶6. Walker observed Brown exit the store carrying a cash register among other items. Brown returned to the vehicle and placed the cash register and a handgun on the front seat. Upon entering the vehicle, Brown allegedly told Walker, "You better not move, and you better not say anything. If you love me you won't say anything." Brown started the vehicle and Brown and Walker headed into town.

¶7. Once in town, they proceeded to the 200 block of Martin Luther King Street, an area frequented by drug dealers and users. Once there, Brown removed the cash register from the passenger compartment and put it in the bed of the truck. Brown then allegedly gave Walker some of the money from the register, in coin and currency, and told her to "go and score some dope." Included in the currency Brown gave to Walker was a two-dollar bill. Walker then proceeded to buy some crack cocaine which she and Brown smoked.

¶8. Once this supply was depleted, Brown wanted more and told Walker that he wanted some more crack cocaine; "he had to have some more, and he didn't care what I [Walker] did or how I [Walker] got it, he wanted some more." Walker then went to Floyd Newman and pawned the .22 caliber handgun for $20. This was the same handgun that Brown had earlier placed on the front seat of the vehicle when leaving the Charter Food Store. Brown and Walker then purchased and smoked additional crack cocaine.

¶9. They finished the drugs early on the morning of August 8 and they then walked to the home of Walker's sister located on Bishop Street in Natchez, Mississippi. Upon arrival at her sister's home, Walker and Brown sat outside on the porch until the family began to stir and the sister came outside to get the morning paper. Once inside, they relaxed and watched television.

¶10. Throughout the morning of August 8 and continuing that day and the next, Walker, an eye-witness to the robbery, made several calls to the Natchez Police Department attempting to tell them about the incident at Charter Food Store. Within twenty-four hours of the robbery, the police received information that a .22 caliber handgun had been pawned by Walker; and approximately forty-eight hours after the robbery, the police recovered a two-dollar bill with a serial number matching that of the one kept in the cash register at the Charter Food Store. The serial number had been noted in an effort to aid police in their investigation in case of a robbery at the store. Walker proved to be the source of that two-dollar bill. With this information, the police began searching for Walker and Brown. On August 11, 1992, they were spotted; both Walker and Brown attempted to

elude police by fleeing and hiding. When confronted by the police, Brown blurted out, "You got me for driving the car." Brown and Walker were arrested and charged with the murder of Day.

¶11. While in jail awaiting trial, Walker began receiving notes and letters from Brown. The notes and letters from Brown to Walker contain incriminating statements requesting her to keep quiet and not to turn State's evidence. Some examples include: "But we must be strong if we are going to beat this stuff . . . just tell them that you don't know anything"; "[t]hey don't have anything on me unless you go against me . . . . They don't have anything at all, so they are going to try and scare you"; and, "Rachel, my lawyer told me that you are on tape and paper making a full confession of what happened. He said that the police had sent the pistol to a lab in Jackson to find out if the bullets matched the one that killed the woman. If bullets don't match, then they have no case. Flush after you read this."

¶12. While incarcerated in the Adams County Jail, Brown allegedly confided to a fellow inmate, Larry Bernard ("Bernard"), that he took the cash register from the Charter Food Store and that he shot Day three or four times. Bernard notified the Adams County Sheriff's Department of Brown's communication. Testimony revealed that Bernard received no favorable treatment or special consideration for his testimony at trial.

¶13. Walker, an ex-girlfriend, eye-witness and accessory after the fact, testified for the State. Through her testimony, the cash register, two-dollar bill and handgun were linked to Brown. Walker's testimony also placed Brown at the scene of the crime as the triggerman. Walker's testimony was corroborated by a fellow inmate of Brown and the State's ballistics expert, in addition to Brown's own incriminating statements made in writing to Walker while incarcerated.

¶14. A jury, duly impaneled from the citizens of Amite County, Mississippi, found Brown guilty as charged and returned a verdict that Brown suffer death. Judge Watson sentenced Brown to death by lethal injection. From an order denying his motion for a new trial, Brown perfected this appeal.

## DISCUSSION OF THE LAW

### I. THE COURT BELOW ERRED IN DENYING APPELLANT'S MOTION FOR DIRECTED VERDICT BECAUSE THE TESTIMONY OF AN ACCOMPLICE OR CO-CONSPIRATOR IS INSUFFICIENT TO SUSTAIN A CONVICTION WHEN THAT TESTIMONY IS SUBSTANTIALLY IMPEACHED, UNREASONABLE, OR SELF-CONTRADICTORY.

¶15. Brown's first assignment of error claims that the trial court erred in not granting his motion for a directed verdict. Brown argues that the uncorroborated accomplice testimony of the State's chief witness, Walker, cannot be used to sustain Brown's conviction on the charge of capital murder because it was unreasonable, self-contradictory and substantially impeached. Walker subsequently pleaded guilty to being an accessory after the fact to murder and was sentenced to five years imprisonment.

¶16. Citing *Flanagan v. State*, Brown contends that "although the general rule in Mississippi is that the *uncorroborated* testimony of an accomplice or a co-conspirator may be sufficient to sustain a

conviction, 'the general rule is inapplicable in those cases where the testimony is unreasonable, self contradictory, or substantially impeached.'" *Flanagan v. State*, 605 So. 2d 753, 758 (Miss. 1992) (emphasis added) (citing *Mason v. State*, 429 So. 2d 569, 571 (Miss. 1983). However, as the State contends, this Court held in *Mason* that "[w]here there is slight corroborative evidence, the accomplice's testimony is likewise sufficient to sustain the verdict." *Mason v. State*, 429 So. 2d at 571.

¶17. Referencing numerous instances, Brown contends that Walker's testimony was unreasonable, self-contradictory and substantially impeached. Brown further contends that Walker's prior inconsistent statements were never fully examined because the jury never saw the videotaped statements at trial. However, a review of the record evidences that Brown never went beyond using the videotapes as an offer of proof of her statements. Counsel for Brown raised the videotape issue when discussing the admissibility of certain letters outside the presence of the jury. The trial court requested that counsel wait until the proper point in their case to proffer the tapes but allowed defense counsel to use their notes from the tapes on impeachment. Defense counsel never raised the tapes again until the jury was in its deliberations at which time counsel requested the tapes be made a part of the record on appeal. The court then allowed the tapes to be made a part of the record but did not permit them to be shown to the jury.

¶18. During cross-examination, Walker did not dispute making the prior statements. As the State notes, when a witness admits making a prior out-of-court inconsistent statement, which has been reduced to writing, the statement should not be introduced into evidence. *Moffett v. State*, 456 So. 2d 714, 719 (Miss. 1984). *See also, Foster v. State*, 508 So. 2d 1111, 1119 (Miss. 1987) (tape recordings of prior inconsistent statements are not admissible where witness admits he made the statements).

¶19. The State argues that Walker's contradictory statements are insignificant and, most importantly, "none of her statements contradict any material element of murder in the commission of a robbery."

¶20. As to suppressing the testimony of the State's witness, Walker, the State was entitled to present to the jury this testimony for whatever it was worth. *Wilson v. State*, 234 So. 2d 303 (Miss. 1970); *Hutchins v. State*, 220 So. 2d 276 (Miss. 1969). Without this testimony the State may not have been able to establish the charges set forth in the indictment. It is to be noted that a conviction can be obtained upon the uncorroborated testimony of an accomplice, but when it is so based then strict rules relating to the testimony must be followed. Where the State's evidence rests solely upon the testimony of an accomplice witness, this Court has held that the trial court errs in failing to give a cautionary instruction. *See Holmes v. State*, 481 So. 2d 319, 322-23 (Miss. 1985); *Hussey v. State*, 473 So. 2d 478, 480 (Miss. 1985).

¶21. Although the State's case is based largely upon the testimony of accomplice Walker, it should be remembered that the testimony of Walker is not uncorroborated. Testimony was presented from Bernard, Brown's fellow inmate at the Adams County Jail, that Brown admitted to the robbery and killing. The State's ballistics expert, Byrd, testified that the bullet fragments removed from the decedent's body bore the "same characteristics or characteristics consistent with" the alleged murder weapon. Therefore, the main issue in this cause is: Was the testimony of accomplice Walker so uncorroborated as to make it improbable, self-contradictory, not reasonable and substantially

impeached?

¶22. This Court made a careful study of the rule with reference to the testimony of an accomplice in the case of *Feranda v. State*, 267 So. 2d 305 (Miss. 1972). In *Feranda*, this Court held that uncorroborated testimony of an accomplice when reasonable was sufficient to sustain a verdict of the jury.

> Although uncorroborated testimony of an accomplice is looked upon with suspicion in practically all courts, and some courts refuse to convict on uncorroborated testimony of an accomplice, nevertheless, at common law [20 Am.Jur.Evidence § 1235, at 1088 (1939)] and under the decisions of this State [*Feranda*, *supra*] it is well settled that such testimony, although entirely without corroboration, will support a verdict of conviction.

*Moore v. State*, 291 So. 2d 187, 189 (Miss. 1974).

¶23. In *Derden v. State*, this Court held that: "clear law in the State of Mississippi is that the jury is to regard the testimony of co-conspirators with great caution and suspicion." *Derden v. State*, 522 So. 2d 752, 754 (Miss. 1988); *Winters v. State*, 449 So. 2d 766, 771 (Miss. 1984); *Simpson v. State*, 366 So. 2d 1085, 1086 (Miss. 1979); *Thomas v. State*, 340 So. 2d 1, 2 (Miss. 1976). This Court has embraced a principle that the granting of a cautionary instruction regarding the testimony of an accomplice witness is discretionary with the trial court. *Wheeler v. State*, 560 So. 2d 171, 172 (Miss. 1990); *Derden v. State*, 522 So. 2d 752, 754 (Miss. 1988); *Van Buren v. State*, 498 So. 2d 1224, 1229 (Miss. 1986); and *Holmes v. State*, 481 So. 2d 319, 322 (Miss. 1985).

¶24. The testimony of the accomplice, partially corroborated by Bernard and Byrd, presented purely a question of fact to be determined by the jury as to whether or not Brown was guilty of the robbery and subsequent shooting of Day. Brown, by his admission to Bernard and incriminating letters to Walker, corroborates the essential facts sufficiently so that the jury could hold that Brown was guilty of the robbery and shooting death of Day.

¶25. This Court frequently has held that, when judging the sufficiency of the evidence during a motion for a directed verdict, the trial judge is "required to accept as true all of the evidence that is favorable to the State, including all reasonable inferences that may be drawn therefrom, and to disregard evidence favorable to the defendant." *Noe v. State,* 616 So. 2d 298, 302 (Miss. 1993). *See also*, *Clemons v. State*, 460 So. 2d 835 (Miss. 1984); *Forbes v. State*, 437 So. 2d 59 (Miss. 1983); and *Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

¶26. On this record we cannot say that Brown would have been convicted without Walker's testimony. The Court properly gave the accomplice instruction, designated in the case *sub judice* as D-10, in addition to a general credibility of testimony instruction, designated as D-8, and the trial court did not commit error by admitting Walker's testimony and not granting a Directed Verdict in favor of Brown. *See*, *Griffin v. State*, 533 So. 2d 444, 449 (Miss. 1988).

¶27. The trial court correctly held that the evidence was sufficient to withstand a directed verdict. This assignment of error is without merit.

## II. THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF A "JAIL

**HOUSE SNITCH" TO CORROBORATE THE TESTIMONY OF A CO-CONSPIRATOR AND ACCOMPLICE.**

¶28. Appellant contends the trial court erred by allowing the testimony of a "jail-house snitch." Brown contends that Bernard had a double motive for testifying against him: 1) Bernard hoped to make a deal regarding Bernard's pending charges and 2) as possible revenge for an attack which occurred on Bernard while in jail. However, a review of the record evidences no reference to this double motivation.

¶29. A hearing was held on Brown's motion to suppress Bernard's testimony and the trial court overruled the motion, deciding to "hear the case and make the rulings accordingly." The trial court ruled further that, "if this witness testifies, [the court would] instruct the jury according to the law."

¶30. Prior to Bernard's testimony, defense counsel again moved to suppress Bernard's testimony on the theory that his testimony was unreliable as being that of a "jailhouse snitch" and that it was contradictory to that of Walker. A second hearing was held on Brown's motion to suppress Bernard's testimony.

¶31. Bernard testified that he received no favorable treatment in exchange for his testimony. In addition, the State assured the court that Bernard was not your typical "jailhouse snitch," one that is planted by law enforcement to elicit testimony from an inmate. Bernard was already being held in the Adams County Jail when the alleged conversation took place and he made the Sheriff's Department aware of it on his own. When asked if he received any favorable treatment, Bernard testified that he did it "in my own free will." The trial court denied Brown's motion on other grounds which will be discussed in the next assignment of error. Bernard testified *and it should be noted that defense counsel did not cross-examine Bernard.*

¶32. This Court, in upholding a trial court's decision to admit "snitch" testimony, has held that "[t]he credibility of a witness, even a convict witness, is for the jury." ***Sudduth v. State***, 562 So. 2d 67, 70 (Miss. 1990). In ***Carr v State***, this Court recently held that in the absence of evidence that a witness stood to gain anything by his testimony, the witness's statements were not inherently unreliable. A witness's "criminal record, character, motivation, reliability and the circumstances surrounding his recitation of statements made . . . were all factors properly left to the jury to weigh." ***Carr v. State***, 655 So. 2d 824, 837 (Miss. 1995).

¶33. It is also important to note that as in ***Carr***, the trial court granted a defense instruction, designated as D-11 concerning the testimony given by an informant.

¶34. The trial court did not err in allowing Bernard to testify regarding statements Brown made to him while in jail; therefore, this assignment of error is without merit.

> **III. THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF A WITNESS WHO HAD BEEN PRESENT IN THE COURTROOM AFTER THE SEQUESTRATION RULE HAD BEEN INVOKED.**

¶35. Brown argues that it was error for the trial court to permit the testimony of a witness who had violated the invoked rule of sequestration and had heard a portion of trial testimony. Brown asserts

further that "it was clear error on the part of the trial judge to fail to adequately investigate this violation of the rule by Bernard." The State disputes Brown's contention that Bernard heard more than just a few minutes of testimony.

¶36. M.R.E. 615 provides that, at the request of a party, the court shall order witnesses excluded from the courtroom so that they cannot hear the testimony of other witnesses. Often called "the rule," the witness exclusion rule serves to discourage a witness's tailoring his testimony to what he has heard from the stand and the rule serves to facilitate exposing false testimony. *Powell v. State*, 662 So. 2d 1095, 1097-98 (Miss. 1995) (citing *Baine v. State*, 606 So. 2d 1076, 1083 (Miss. 1992); *Moffett v. State*, 540 So. 2d 1313, 1317 (Miss. 1989); *Doby v. State*, 532 So. 2d 584, 589 (Miss. 1988)). Remedies for violations include prohibiting the witness from testifying, striking his testimony, citing him for contempt, or allowing a "full-bore" cross-examination. *Gerrard v. State*, 619 So. 2d 212, 217 (Miss. 1993). It is within the trial judge's discretion to determine what remedy is appropriate. *Baine v. State*, 606 So. 2d 1076, 1083 (Miss. 1992).

¶37. In the case *sub judice*, the trial court allowed Bernard to be examined while the jury was out, as well as allowing a "full-bore" examination when the jury returned. The proceedings from the trial court's inquiry of Bernard, as conducted in the chambers of the trial judge, are as follows:

**LARRY BERNARD**, having been duly sworn, answered questions on his oath as follows, to-wit:

**THE COURT**:

Q. Do you recall--I believe it was day before yesterday when you came and entered the courtroom?

A. Correct.

Q. How long were you in the courtroom?

A. Approximately two minutes--two or three minutes at the maximum.

Q. As the Court recalls after the Court's attention was drawn thereto, you were seated in the rear part of the courtroom by the bailiff by the door, rear door; is that correct?

A. Yes, Sir.

Q. Do you recall who was testifying at the time you entered the courtroom?

A. Yes, Sir. Uh, Mr. Don was up, and precisely I recall they was discussing about the garment that this lady was wearing.

Q. Who was testifying? Do you recall who was testifying?

A. What's his name? The guy who works at the bar, whatever his name is with the geri curl?

Q. Newman?

A. I don't know his name, but I know him when I see him. He said he was running a club during

the time that this incident occurred.

Q. And is that about all you heard?

A. That's about all, and he was discussing about the garments had been cut from the autopsy, but I didn't hear too much more than that, because I was asked to leave the courtroom.

Q. And you state under oath that you were in the courtroom two or three minutes?

A. At the maximum.

Q. At the maximum?

A. Yes, Sir.

**THE COURT**: I'm going to allow counsel to cross examine the witness.

**CROSS EXAMINATION BY MS. FERRINGTON**:

Q. Mr. Bernard, is it your testimony that you heard only one witness testifying?

A. Correct.

Q. And is it your testimony that that witness was Mr. Floyd Newman?

A. Yes, Ma'am.

Q. OK, and could you tell us again what you heard?

A. I heard them speaking of the blood in the garment and that the garment had been cut, but that's practically all I heard, because I was asked to leave the courtroom. I looked at you, and you looked at Mr. Don, and you said, "Isn't that Larry Bernard?" And he said, "Yes." And then ya'll asked me to leave the courtroom, and I walked out.

Q. OK, who asked you specifically to leave? Was it me or was it Mr. Harper?

A. I just heard a voice.

**THE COURT**: I asked him to leave.

A. OK, I just heard a voice.

**THE COURT**: Well, the record can note that I recall having asked him to leave from the bench.

**MS. FERRINGTON**: That's all I have, Your Honor.

**THE COURT**: Mr. Johnson, as I understand it, this witness' proffered testimony would not be in any way related to what has been said?

**MR. JOHNSON**: It's limited, Your Honor, to statements by the defendant following his

incarceration in August of 1990--August after this crime.

**MR. HARPER**: It was August a year, 1993.

¶38. At the completion of this inquiry the trial court issued its ruling, in which the court stated:

All right. The Court is going to make its rulings. It appears from the record in this case, and the Court does recall that the second day of the trial the proffered witness entered the courtroom from the rear and sat down in an empty chair next to the bailiff situated at the extreme rear part of the courtroom next to the rear door.

Thereafter, Mrs. Ferrington, attorney for the defendant, called the attention of the presence of this man to the attorneys for the State and also the Court observed that; whereupon the State immediately under the Court's directions removed the proffered witness, who is Larry Bernard, from the courtroom. Now, this proffered witness has been brought before the Court in chambers in the presence of the defendant and his attorneys and has been questioned under oath and states that he was in the courtroom a maximum of two or three minutes, and he heard something about a discussion of a garment of the decedent.

The Court understands that the proffered testimony will be concerning statements made by the defendant to the proffered witness. While there's no doubt there has been a technical violation of the rule, nevertheless, the undisputed evidence before the Court is that this consisted of a witness inadvertently entering the courtroom for a period, maximum period of two or three minutes. Now, under the holdings of the decision, it's the duty of the trial court to ascertain whether there has been prejudicial action against the defendant.

The Court has viewed the decisions and is of the opinion that the entrance of the proffered witness for a maximum period of two or three minutes is not prejudicial to this defendant. However, the Court will allow counsel for the defendant to exercise, and I believe the Supreme Court has referred to it as a "full bore" cross examination in regard to the technical violation by the proffered witness as heretofore stated.

¶39. In *Douglas v. State*, this Court held that, "[w]hen [a] violation of the sequestration rule is assigned as error on appeal, the failure of the judge to order a mistrial or to exclude testimony will not justify reversal on appeal . . . absent a showing of prejudice sufficient to constitute an abuse of discretion." *Douglas v. State*, 525 So. 2d 1312, 1318 (Miss. 1988). As Bernard's testimony, at best, was cumulative, Brown was not prejudiced to the extent necessary to require reversal.

¶40. "Regarding scope of review, this Court will not *per se* reverse a trial court for failing to order a mistrial after a witness exclusion rule violation. The resultant degree of prejudice to the defendant must first demonstrate that the trial court abused its discretion." *Baine v. State*, 606 So. 2d 1076, 1083 (Miss. 1992) (citing *Douglas v. State*, 525 So. 2d 1312 (Miss.1988). As indicated by the mandatory language of the rule, the trial court does not have any discretion in its application; the court must apply it when a party invokes it. *Douglas v. State*, 525 So. 2d 1312, 1316 (Miss. 1988).

¶41. Once a witness has violated the rule, however, the remedy lies within the court's discretion. *Douglas*, 525 So.2d at 1317 (citing *United States v. Warren*, 578 F.2d 1058, 1076 (5th Cir. 1978)).

Remedies may include prospectively excluding the witness where prejudice will otherwise ensue; striking the witness's testimony where connivance gave rise to the testimony; striking the witness's testimony where the testimony gave rise to prejudice; or, most appropriately, allowing the other party to subject the witness to a "full-bore cross-examination" on the facts of the rule violation. *Douglas*, 525 So. 2d at 1317 (citing *United States v. Jimenez*, 780 F.2d 975, 981 (11th Cir. 1986); *United States v. Blasco*, 702 F.2d 1315, 1327 (11th Cir. 1983); *Warren*, 578 F.2d at 1076, n. 16). The court may also instruct the jury that it may consider the rule violation when the jury evaluates the violating witness's credibility. *Douglas*, 525 So. 2d at 1317 (citing *Jimenez*, 780 F.2d at 981; *United States v. Cox*, 752 F.2d 741, 748 (1st Cir. 1985)).

¶42. In the case *sub judice*, the trial court held a hearing outside the presence of the jury to ascertain just what the witness heard and to determine what, if any, prejudice Brown suffered. Defense counsel was given the opportunity to fully cross-examine Bernard before the jury; however, counsel chose to not cross-examine this witness at all.

¶43. "[S]triking the testimony is a serious sanction and should be used only where a party has suffered actual prejudice and there has been connivance by the witness or counsel to violate the rule." *Douglas*, 525 So. 2d at 1318 (citing *United States v. Blasco*, 702 F.2d 1315, 1327 (11th Cir. 1983)). A review of the record reflects that there was no evidence that Bernard deliberately attempted to circumvent the sequestration rule. Therefore, the appropriate remedy was to allow defense counsel the opportunity to fully cross-examine this witness on the facts of the rule violation. The trial court conducted an investigation of the rule violation and ruled that Bernard could testify. According deference to the trial court's inquiry, we hold that the trial court did not err and that this assignment of error is without merit.

### IV. THE TRIAL COURT ERRED IN ADMITTING A .22 HANDGUN AND TESTIMONY RELATIVE TO THE WEAPON INTO EVIDENCE WHEN THE CHAIN OF CUSTODY HAD BEEN BROKEN AND ITS PROBATIVE VALUE WAS SUBSTANTIALLY OUTWEIGHED BY THE POTENTIAL FOR PREJUDICE AND FOR MISLEADING THE JURY.

¶44. Brown argues in this assignment of error that the trial court erred in admitting the .22 caliber handgun into evidence. He contends that, although the gun may have met the relevancy requirement set forth in M.R.E. 401, its prejudicial effect outweighs the probative value as set forth in M.R.E. 403, and therefore the handgun should have been excluded. Brown cites *Foster v. State*, 508 So. 2d 1111, 1118 (Miss. 1987), for the proposition that the testimony of the State's ballistics expert, Byrd, would mislead the jury.

¶45. The State, also citing *Foster*, contends that M.R.E. 401 "is a broad one, favoring admissibility. . . . The trial court is afforded broad discretion in weighing these interests." *Foster*, 508 So. 2d at 1117. The State also argues that *Foster* can easily be distinguished from the case *sub judice*. The evidence against Foster was largely circumstantial; there was no eyewitness who saw Foster kill. In the case *sub judice*, we have an eyewitness, Walker, who testified that the handgun was the same as used during the robbery. We have the corroborative testimony of Bernard, who testified that Brown admitted to shooting Day; and the state's expert, Byrd, was able to link the handgun to the victim's injuries. Thus Byrd was able to partially corroborate Walker's testimony.

¶46. The testimony of Byrd, though not definitive on the issue of whether the handgun in question fired the projectiles that killed Day, was in accordance with that suggested in *Foster*. Byrd testified that three of the four projectiles taken from Day's body bore "class characteristics consistent with this gun and could have been fired in this gun" and that "it's possible that all four of these could have been fired in this gun." The opinion in *Foster* held, essentially in dicta, that the terms "possible" and "could have" *should* be avoided. *Foster*, 508 So. 2d at 1118. This Court did, however, hold that an expert could use language such as "cannot be excluded" or "is consistent with." *Id.*

¶47. As this Court also stated in *Foster*, appellate review is simply to "determine whether the trial court abused its discretion" in admitting the evidence. *Id.* The handgun may have been admitted into evidence through the eye-witness testimony of Walker without the testimony of the ballistics expert. Brown has not asserted nor shown that he was denied a fair trial or due process of law by the testimony of this expert or the admission of the handgun. The admission into evidence of the handgun was not error.

¶48. Brown also argues that the chain of custody concerning the handgun was broken, and therefore the handgun's admission into evidence was error. The State responds holding this assignment of error as procedurally barred as there was never an objection concerning the chain of custody of the handgun. The State contends that the objection of record concerned the admission of the gun based on the ballistics expert's testimony discussed above.

¶49. The record reflects that the State attempted to introduce the gun into evidence during the testimony of Officer Dawson. At this time, defense counsel renewed their previous objection "for the grounds stated therein." The previous objection raised by defense counsel derives from Brown's motion to preclude admission of a .22 caliber handgun. No reference to a chain of custody objection can be found in this motion. A hearing was held on defense counsel's motion and it was overruled.

¶50. As we have previously held, an objection on one or more specific grounds constitutes a waiver of all other grounds. *See Conner v. State*, 632 So. 2d 1239, 1255 (Miss. 1993); *Fleming v. State*, 604 So. 2d 280, 292 (Miss. 1992); *Stringer v. State*, 279 So. 2d 156, 158 (Miss. 1973). This issue was not adequately presented in Brown's motion for a new trial. A general allegation that "[t]he Court erred in denying Defendant's Evidentiary Motions" is insufficient. This Court has also held that an objection at trial cannot be enlarged in a reviewing court to embrace an omission not complained of at trial. *McGarrh v. State*, 249 Miss. 247, 276, 148 So. 2d 494, 506 (1963).

¶51. Notwithstanding that this issue is procedurally barred, this assignment of error is also without merit. Whether a chain of custody has been properly established is left to the discretion of the trial court. *Nalls v. State*, 651 So. 2d 1074 (Miss. 1995); *Wells v. State*, 604 So. 2d 271 (Miss. 1992).

¶52. The record reflects that Newman testified that after he got the gun from Walker, he placed the shells, both spent and live, in an ashtray and took the gun in his house. Newman then gave Officer Jones the firearm and shells that were in the ashtray. Officer Jones testified that he received the gun and some spent rounds and some live rounds in a bag. Officer Jones, in turn, gave the handgun, some live rounds of ammunition and some spent cartridges to Officer Dawson, who secured them in the trunk of his patrol unit. Officer Dawson then gave the handgun, live rounds and spent shells to Officer McGehee, an evidence technician. McGehee testified that he sent the gun and shells to the Mississippi Crime Lab. Byrd testified that he received the evidence at the Crime Lab from the

Natchez Police Department.

¶53. This Court has held that "should a chain of custody objection arise, the trial court should inquire whether there is any indication or reasonable inference of probable tampering with or substitution of the evidence." **Wilson v. State**, 574 So. 2d 1324, 1335 (Miss. 1990). Although there may have been inconsistent statements made by Officer Dawson during a preliminary hearing concerning the number of live and spent shells exchanged, there was no inference that the evidence that was admitted had been tampered with or substituted. Defense counsel never asked that the evidence be withdrawn or stricken from the record, nor did defense counsel ask that the jury be instructed to disregard the evidence.

¶54. Brown has not asserted or shown that he was denied a fair trial or due process of law by the testimony of this expert or the admission of the handgun. Defense counsel made no objection alleging the evidence had been tampered with or substituted. Therefore, the admission into evidence of the handgun was not error.

### V. THE TRIAL COURT ERRED IN ADMITTING CERTAIN LETTERS INTO EVIDENCE THAT WERE WRITTEN BY APPELLANT TO RACHEL WALKER AFTER HE HAD ASSERTED HIS CONSTITUTIONAL RIGHTS TO SILENCE AND TO COUNSEL.

¶55. In this assignment of error Brown argues that, during the time he and Walker were in correspondence, Walker was acting as an agent of the State and any letters written to Walker by Brown were inadmissible, as Brown had invoked his constitutional right to counsel and these communications were in violation of his **Miranda** rights. The State's response states that there was no agreement for Walker to act as an agent of the State. Although Walker had previously given the Natchez Police Department information on other criminal matters, if she intentionally elicited incriminating statements from Brown through letters and notes, she did so on her own without the knowledge or approval of the State. "As one of the prosecutors stated during this motion, by no stretch of the imagination could Rachel Walker be considered an agent of the State."

¶56. A review of the record evidences that after their arrest Brown and Walker were both held in the Adams County Jail. While in custody, Brown was able to talk to Walker on the cell block and made certain statements against his interest to Walker. Once Walker was moved out of the cell block, Brown sent her notes and subsequently wrote her a series of letters. As noted earlier, the notes and letters from Brown to Walker contain incriminating statements requesting Walker to keep quiet and not to turn State's evidence.

¶57. The United States Supreme Court, in **Massiah v. United States**, 377 U.S. 201 (1964), and **United States v. Henry**, 447 U.S. 264 (1980), provided guidance on the use of government agents. Where a co-defendant specifically agrees to work as an agent of the government, statements made to the co-defendant by the defendant were inadmissible. The State argues that in the case *sub judice*, Walker acted on her own without the State's knowledge or approval. The State cites an opinion of the Court of Appeals for the District of Columbia Circuit, **United States v. Watson**, 894 F.2d 1345 (D.C. Cir. 1990), which appears to have facts similar to those in the case *sub judice,* in which the court held:

> It is established in the case law that in order for there to be a Massiah-type violation of a defendant's sixth amendment right to counsel, the person eliciting the incriminating information must be acting as a government agent.
>
> . . . .
>
> We join the circuits that have expressly "refuse[d] to extend the rule in Massiah and Henry to situations where an individual, acting on his own initiative, deliberately elicits incriminating information.

*Watson*, 894 F.2d at 1347. The court noted that Young, who was incarcerated with Watson on an unrelated charge, was acting as "an entrepreneur" and, even though he may have hoped to exchange the information for favorable treatment, the government did not direct his actions. *Id.* at 1348.

¶58. In the case *sub judice*, the trial court investigated the facts behind the letters before they were admitted. There were as many as thirty-nine letters under consideration for admission prior to the State's agreement to limit the evidence to nine letters.

¶59. The letters were written before Walker's plea which was entered on February 10, 1993. At the time of Walker's plea, the letters were in the possession of her attorney and the State was not made aware of them until after her entry of a plea. They were obtained from Walker's attorney under a subpoena duces tecum.

¶60. The State strongly contends that Walker did not, in fact could not, have used these letters in an attempt to get favorable treatment from the State. The State contends further that Brown failed to make a record for his contention that Walker was an agent for the State. The State wasn't even aware of their existence until after her guilty plea was entered. Although during an interview with police Walker asked what she should do because Brown was trying to talk with her and she didn't know how to handle it; and although Walker was told to let the police know if she found anything out and to give them any letters he might write to her; Walker was repeatedly told in that same interview that the police could make no promises to her or make any deals with her.

¶61. Walker, probably very street-wise, did whatever she could do to better her position in the legal troubles she was facing. Although she may have obtained information from Brown which the State found quite incriminating and useful in their prosecution, the timing of the State's realization of its existence resulted in no benefit to Walker. It was her forthright communications with authorities that resulted in her being able to plea to a lesser charge than that of capital murder.

¶62. The police conducted a proper investigation and attempted to elicit as much information from Walker as they could without crossing the line of entering into any agreement with her for a lesser charge in exchange for incriminating statements from Brown. No proof of agency was established by the defense at trial. No evidence was produced at trial which evidences Walker deliberately attempted to elicit incriminating statements from Brown. Brown was scared to death and unfortunately said and wrote too much. The letters were carefully reviewed by the trial court for their content and nature of origin. Therefore, the trial court did not err in admitting the letters at trial and this assignment of error is without merit.

## VI. THE TRIAL COURT ERRED IN ADMITTING UNNECESSARY AND GRUESOME AUTOPSY PHOTOGRAPHS INTO EVIDENCE.

¶63. Brown asserts that the circuit court erred in allowing into evidence three 8" x 10" color photographs taken of the deceased in addition to three x-ray photographs. The defense objected to both the size and the fact that they were color photographs when black-and-white photographs would have been sufficient. The State contends that the trial court was correct in allowing the admission of photographs designated as Exhibits 12, 13 and 14. The photographs were taken prior to the autopsy and show the wounds on the body of the deceased.

¶64. The trial court conducted a hearing outside the presence of the jury as to the admissibility of the questioned photographs. Counsel for the defense argued that color photographs were being used to inflame the jury and that the photographs were unnecessary, given the x-rays, and therefore cumulative in nature and inadmissible. The State countered with the argument that the photographs in question were narrowly done, taken from relatively close range, not overly gruesome and necessary to properly show the wounds and resulting tissue damage. In addition, the State contends that, although the x-rays show "the locations of the projectiles in the body," the photographs show "the exterior wounds where the projectiles entered the body. And I know in two of these projectiles, they wound up quite a distance in the body from where they entered the body." Such evidence was necessary to show the possible angle from which the bullets causing the wounds were fired. This evidence could support the "avoiding arrest" aggravator; two bullets were fired directly into the victim at the robbery, and two more into the victim's back assured her death.

¶65. After reviewing the photographs and a lengthy discussion, the trial court agreed to admit the photographs, requiring one to be cropped prior to its admission. The photographs were introduced during the testimony of Officer McGehee, who indicated that the photographs accurately depicted the gunshot wounds Day sustained to her head, breast and back.

¶66. Brown contends that the State's Exhibits Nos. 12, 13 and 14 were highly prejudicial and had no probative value, thus violating M.R.E. 403, art. III, §§ 14, 22, 26 and 28 of the Mississippi Constitution and the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

¶67. In *Westbrook v. State*, 658 So. 2d 847, 849 (Miss. 1995), this Court held that photographs have evidentiary value where they aid in describing the circumstances of the killing and the corpus delicti, *Williams v. State*, 354 So. 2d 266 (Miss. 1978); describe the location of the body and cause of death, *Ashley v. State*, 423 So. 2d 1311 (Miss. 1982); or supplement or clarify witness testimony, *Hughes v. State*, 401 So. 2d 1100 (Miss. 1981).

¶68. The admissibility of photographs rests within the sound discretion of the trial court. *Griffin v. State*, 557 So. 2d 542, 549 (Miss. 1990); *Mackbee v. State*, 575 So. 2d 16, 31 (Miss. 1990); *Boyd v. State*, 523 So. 2d 1037, 1039 (Miss. 1988); *Smith v. State*, 419 So. 2d 563, 567 (Miss. 1982), *cert. denied* 460 U.S. 1047 (1983) (*overruled on other grounds by Willie v. State*, 585 So. 2d 660 (Miss. 1991)). Furthermore, the decision of the trial judge will be upheld unless there has been an abuse of discretion. *Reynolds*, 658 So. 2d at 849; *Herring v. State*, 374 So. 2d 784, 789 (Miss. 1979).

¶69. The "discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Hart v. State*, 637 So. 2d

1329, 1335 (Miss. 1994) (quoting *Williams v. State*, 544 So. 2d 782, 785 (Miss. 1987)). As was noted in *Taylor v. State*, this Court has held photographs "to be so gruesome and inflammatory as to be prejudicial in only one circumstance, a close-up photograph of a partly decomposed, maggot-infested skull." *Taylor v. State*, 672 So. 2d 1246, 1271 (Miss. 1996).

¶70. The pictures at issue, although certainly not pleasant to look at, are not comparable to those described in *McNeal v. State*, 551 So. 2d 151 (Miss. 1989), the case upon which Brown relies. Further, they serve to clarify and supplement the testimony and to describe the cause of Day's death. Accordingly, it is our opinion that the trial judge did not abuse his discretion in admitting the photographs and that this assignment of error is without merit.

### VII. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY TO CONSIDER THE ROBBERY AS AN AGGRAVATING CIRCUMSTANCE IN VIOLATION OF STATE LAW AND CONTRARY TO CONSTITUTIONAL PROHIBITIONS AGAINST CRUEL AND UNUSUAL PUNISHMENT.

¶71. Instruction S-2 allowed the jury to consider as an aggravating circumstance "[w]hether the capital offense was committed while the defendant, Joseph Patrick Brown a/k/a Peanut, was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit armed robbery." Brown argues on appeal that "submission of this aggravating circumstance does not narrow the class of death-eligible defendants in a rational manner, thus it violates the Eighth Amendment."

¶72. Brown contends that the "robbery" aggravating circumstance used in the instruction is neither "determinate" nor "genuinely narrow" as required under *Arave v. Creech,* 507 U.S. 1029; 113 S. Ct. 1534 (1993). In *Creech*, the United States Supreme Court stated:

> Our precedents make it clear that a State's capital sentencing scheme must . . . *"genuinely narrow* the class of defendants eligible for the death penalty." When the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so. *If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm.*

113 S. Ct. at 1542 (citations omitted) (emphasis added).

¶73. The State argues that this Court has rejected this argument in *Ladner v. State*, 584 So. 2d 743 (Miss. 1991) (*modified on other grounds by Willie v. State*, 585 So. 2d 660 (Miss. 1991)), in which it relied on the United States Supreme Court decision, *Lowenfield v. Phelps*, 484 U.S. 231 (1988). In *Ladner*, the Court stated:

> In *Lowenfield v. Phelps*, 484 U.S. 231 (1988), the petitioner sought to have his death sentence vacated on the ground that the sole aggravating circumstance found by the jury at the sentencing phase was identical to an element of the capital crime for which he was convicted. *Id.* at 241. The United States Supreme Court held that when constitutionality required narrowing of the class of persons eligible for the death penalty is accomplished by the legislative definition of capital offenses in the guilt phase (as done in Louisiana and in Mississippi), the

jury's further narrowing in the sentencing phase is not constitutionally required.

584 So. 2d at 763. The State contends that Brown must be ignoring the United States Supreme Court's decision in *Lowenfield*, as well as this Court's recent application of that decision in *Ladner*. *See also* ***Blue v. State***, 674 So. 2d 1184 (Miss. 1996); ***Davis v. State***, 660 So. 2d 1228 (Miss. 1995).

¶74. The doubling-up argument has been repeatedly raised and rejected by this Court. *See* ***Jones v. State***, 517 So.2d 1295 (Miss. 1987) (*overruled on other grounds by* ***Willie v. State***, 585 So. 2d 660 (Miss. 1991), and cases cited therein. This specific allegation of error was addressed in ***Leatherwood v. State***, 435 So. 2d 645 (Miss. 1983), *cert. denied*, 465 U.S. 1084 (1984). In ***Leatherwood***, the appellant contended that it was improper to allow the jury to consider the underlying robbery as an aggravating circumstance. Finding this argument to be without merit, the Court wrote:

> He reasons that since robbery is an element of capital murder, that it should not also be used as an aggravating circumstance as permitted under Mississippi Code Annotated section 97-3-19 (Supp. 1982). The appellant suggests that this causes him to begin the sentencing stage with one aggravating circumstance against him and thus starts at a disadvantage rather than with a clean slate. He argues that the weighing process is already stacked against him before he even gets up to offer anything in mitigation; and that this practice brings us precariously close to the old ways of mandatory, arbitrary statutes condemned in ***Furman v. Georgia***, 408 U.S. 238 (1972). We do not agree with the appellant's contention. Under our capital murder statute, when an accused is found guilty of capital murder arising out of a robbery, he then becomes subject to a jury finding that he should be executed if the jury feels that the facts justify it. However, his execution is not mandated and the jury may properly find that he should be sentenced to life in prison. They may so find whether the defendant puts on any evidence of mitigating circumstances or not. This is a far cry from the old statute which mandated execution upon conviction of a capital offense.
>
> The appellant's argument that he enters into the sentencing phase of the bifurcated trial with one strike against him is correct in one sense--i.e., if he had not been convicted of a capital offense, there would be no need for the sentencing hearing and he would simply be sentenced to serve a life term. This does not mean though that the procedure is unfair or faulty. At the sentencing hearing appellant may put on evidence of mitigating circumstances of an unlimited nature pursuant to section 99-19-101(6) (Supp. 1982) and ***Washington v. State***, 361 So.2d 61 (Miss. 1978), so as to convince the jury that he should not be executed.

***Leatherwood v. State***, 435 So.2d 645, 650 (Miss. 1983). *See also* ***Minnick v. State***, 551 So. 2d 77, 96-97 (Miss. 1989) (*overruled on other grounds by* ***Minnick v. Mississippi***, 498 U.S. 146 (1990) and ***Willie v. State***, 585 So. 2d 660 (Miss. 1991); ***Cole v. State***, 525 So. 2d 365 (Miss. 1987); ***Lockhart v. Fretwell***, 506 U.S. 364 (1983) (not ineffective assistance of counsel to fail to object to aggravating circumstance that duplicated underlying felony).

¶75. The United States Supreme Court has held that as long as the class of defendants eligible for the death penalty is narrowed during the guilt or sentencing phase of the trial, "the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm." ***Lowenfield***, 484 U.S. 231 at 246.

¶76. This issue has been resolved by this Court; this assignment of error is without merit.

### VIII. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT THEY COULD CONSIDER AS AN AGGRAVATING FACTOR THAT THE MURDER WAS COMMITTED FOR THE PURPOSE OF AVOIDING ARREST.

¶77. Brown argues that the trial court erred in allowing the jury to consider the aggravating circumstance of "avoiding or preventing lawful arrest" in Sentencing Instruction S-2. Brown contends that the State adduced no evidence to support the proposition that the murder was motivated by any intent of Brown to conceal his identity as the perpetrator of another crime. The defense insists that there is no reason to believe that Brown shot Day to avoid lawful arrest.

¶78. The State of Mississippi responds contending that the aggravating circumstance enumerated in Miss. Code Ann. § 99-19-101(5)(e) (Supp. 1982), was present in this case. Subsection (5)(e) states: The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. The State notes that Bernard testified that Brown told him that he believed the victim was stalling and she seemed like she was reaching for something. Brown told him that since he didn't want to take any chances, he shot her.

¶79. The record is void of any reference showing that Brown was disguised in any way when he entered or left the store. It is reasonable to believe that Day may have been attempting to stop the robbery by pulling a weapon to defend herself or detain Brown, or she may have been attempting to set off an alarm. The jury found that specific circumstance to exist.

¶80. Each case must be decided on its on peculiar fact situation. If there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to "cover their tracks" so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance. *Leatherwood v. State*, 435 So. 2d 645, 651 (Miss. 1988).

¶81. In the alternative, Brown argues that even if the trial court was correct in submitting the "avoiding arrest" circumstance to the jury, that circumstance should not have gone to the jury undefined.

¶82. This Court has recently held that it was unnecessary to have a limiting instruction defining "avoiding arrest" to narrow the aggravator if the evidence reasonably inferred that avoiding arrest was a substantial reason for the killing. *See Carr v. State*, 655 So. 2d 824 (Miss. 1995); *Chase v. State*, 645 So. 2d 829 (Miss. 1994). In *Evans v. Thigpen*, 631 F. Supp. 274, 283 (S.D. Miss. 1986), *aff'd.* 809 F.2d 239 (5th Cir. 1987) the federal court stated:

> With respect to the "arrest avoidance" factor, Petitioner argues that this aggravating circumstance is subject to an overbroad construction and that the trial court's instructions to the jury were not specific enough to inform it of a limiting construction. In *Gray v. Lucas*, the Fifth Circuit rejected almost identical contentions to those made here. 677 F.2d at 1109-10. It noted that the Mississippi courts had limited the application of the circumstances "to refer to purposefully killing the victim of an underlying felony to avoid or prevent arrest for that felony." So construed, the court observed that this factor was directed to a legitimate state interest and

was "not so broad that it comprehends an impermissibly large group of murders." *Id.* at 1110.

¶83. From the evidence adduced at trial, there is ample ground for the jury to have determined that the crime committed was committed in order for Brown to avoid arrest. In light of the holdings in *Leatherwood*, *Carr*, *Chase* and *Evans*, and the evidence submitted at trial, it is our opinion that the trial court acted within its bounds of discretion when it submitted this instruction to the jury without a limiting instruction.

¶84. Accordingly, the trial court did not err in submitting the "avoiding arrest" aggravator to the jury, and this assignment of error is without merit.

### IX. THE AGGREGATE ERROR IN THE COURT BELOW SERVED TO DENY APPELLANT HIS RIGHT TO A FAIR TRIAL AND REQUIRES REVERSAL OF BROWN'S CONVICTION AND SENTENCE.

¶85. Lastly, Brown contends that, when viewing the prejudicial impact of the array of errors discussed under the preceding assignment of errors, it cannot be said that his trial met the exacting standards of reliability required by the Constitution. Brown notes the "familiar rule" as to the cumulative effect of trial errors:

> It is true that not one of these errors, when considered separately and apart from the others, is sufficient to justify a reversal of the case, but when they are considered as a whole it is our view that they resulted in the Appellant being denied a fair trial. . . . What becomes harmless error in a case with less at stake may become reversible error when the penalty is death.

*Hansen v. State*, 592 So. 2d 114, 142 (Miss. 1991) (quoting *Russell v. State*, 189 So. 2d 90, 91 (Miss. 1939)).

¶86. The State steadfastly maintains that no reversible error has been committed in the trial of this case. Further, the State submits that, since there were no reversible error in either phase of the trial, there can be no cumulative error that necessitates reversal on this assignment. **Foster v. State**, 639 So. 2d at 1303; **Mullen v. Blackburn**, 808 F.2d 1143, 1147 (5th Cir. 1987) (Court of Appeals rejects argument that even if no individual claim entitles petitioner to relief, the claims collectively do not and states that "twenty times zero equals zero.").

¶87. A review of the record evidences that the trial court conducted a remarkably clean and well-run trial. The trial court was careful to investigate all issues raised and properly rule upon each of them. No error, much less reversible error, was committed during the course of trial in the case *sub judice*. Therefore, there is no cumulative error and this issue is without merit.

¶88. In addition to reviewing the legal errors enumerated by the defendant for merit, and pursuant to Miss. Code Ann. § 99-19-105(3) (Supp. 1985), this Court shall determine:

> (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

> (b) Whether the evidence supports the jury's or judge's findings of a statutory aggravating circumstance as enumerated in Section 99-19-101; and

(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

¶89. Since *Jackson v. State*, 337 So. 2d 1242 (Miss. 1976), this Court has upheld the imposition of the death penalty in the cases listed in the appendix. We have carefully reviewed those cases in the appendix and compared them with the case and sentence *sub judice*.

¶90. We find that the sentence of death in the case *sub judice* was not imposed under the influence of passion, prejudice, or any other arbitrary factor; that the evidence supports the jury's finding of statutory aggravating circumstances listed in Miss. Code Ann. § 99-19-101(5) (Supp. 1983); and, after considering the crime and the appellant, we find further that the sentence of death in this case is not excessive or disproportionate to other similar cases in which such sentence has been imposed.

## CONCLUSION

¶91. Having carefully reviewed the record as submitted from the Circuit Court of Adams County, and after hearing oral argument, this Court finds no merit to the assignments of error raised in this appeal and therefore, affirms the conviction of capital murder and sentence of death.

¶92. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH AFFIRMED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7) (1972) AND M.R.A.P. 41(a).**

**PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR.**